FILED

2022 Apr-11  AM 08:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| MORISSA J. LADINSKY, M.D., F.A.A.P.; HUSSEIN D. ABDUL-LATIF, M.D.; ROBERT ROE, individually and on behalf of his minor child, MARY ROE; and JANE DOE, individually and on behalf of her minor child, JOHN DOE.<br><br>    *Plaintiffs*,<br><br>v.<br><br>KAY IVEY, in her official capacity as Governor of the State of Alabama; STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama; JILL H. LEE, in her official capacity as District Attorney for Shelby County; and DANNY CARR, in his official capacity as District Attorney for Jefferson County.<br><br>    *Defendants*. | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **COMPLAINT**

Morissa J. Ladinsky, M.D., F.A.A.P.; Hussein D. Abdul-Latif, M.D.; Robert

Roe, individually and on behalf of his minor child, Mary Roe; and Jane Doe,

individually and on behalf of her minor child, John Doe (collectively "Plaintiffs"),

bring this Action for Declaratory and Injunctive Relief against Defendants Kay Ivey,

in her official capacity as Governor of the State of Alabama; Steve Marshall, in his

official capacity as Attorney General of the State of Alabama; Jill H. Lee, in her official capacity as District Attorney for Shelby County, Alabama; and Danny Carr, in his official capacity as District Attorney for Jefferson County, Alabama (collectively, "Defendants"), respectfully stating as follows:

## PRELIMINARY STATEMENT

1.     This Action is a federal constitutional challenge to the State of Alabama's Vulnerable Child Compassion and Protection Act (the "Act"), passed by the Alabama Legislature on April 7, 2022, and signed into law by Governor Kay Ivey on April 8, 2022.

2.     The Act targets transgender minors, parents of transgender minors, and physicians who provide medical care to transgender minors. It unlawfully denies necessary and appropriate medical treatment to transgender minors and imposes criminal penalties on parents and health care providers who obtain or provide such care.

3.     The Act prohibits all persons in Alabama, including trained professionals, from engaging in, prescribing, performing, or otherwise providing medical treatments recognized as the standard of care for the treatment of gender dysphoria in minors and that are safe, effective, and medically necessary. If this restriction is enforced, medical professionals who administer these medically necessary treatments will face criminal prosecution.

4.     The Act also prohibits parents of transgender minors from consenting to their children receiving this medically necessary care. If this restriction is enforced, parents will not only be unable to obtain that treatment for their children but will also be subject to criminal prosecution. Medical professionals, parents of transgender minors, and the transgender minors themselves all will suffer irreparable harm as a result.

5.     The Act's prohibitions on the provision of safe, effective, and medically necessary care for transgender minors lack a rational foundation and serve no legitimate purpose.

6.     As detailed below, the Act violates Section 1557 of the Affordable Care Act, as well as constitutional guarantees of equal protection and due process, impermissibly intruding into parents' fundamental right to obtain safe, effective, and medically necessary care for their children.

7.     Plaintiffs seek declaratory and injunctive relief to enjoin the enforcement of the Act. Without the injunctive relief sought, the Act will bar the healthcare provider Plaintiffs from being able to administer essential care to their patients, who include transgender minors living in Alabama; will prevent the parent Plaintiffs from obtaining such care for the minor Plaintiffs; and will cause the minor Plaintiffs to be denied essential treatment, causing them irreparable physical and psychological harm.

## PARTIES

I. *Transgender Plaintiffs and Their Parents*

8.     Plaintiff Robert Roe is and has at all relevant times been a resident of Jefferson County, Alabama. He is the father of Plaintiff, Mary Roe, a 13-year-old transgender girl, for whom he also appears in this case as her next friend. Because of concerns about his and his child's privacy and safety, Robert Roe and Mary Roe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, concurrently filed herewith.

9.     Plaintiff Jane Doe is and has at all relevant times been a resident of Shelby County, Alabama. She is the mother of Plaintiff, John Doe, a 17-year-old transgender boy for whom she also appears in this case as his next friend. Because of concerns about her and her child's privacy and safety, Jane Doe and John Doe seek to proceed in this case under a pseudonym. *See* Motion to Proceed Pseudonymously, concurrently filed herewith.

10.     Plaintiffs Jane Doe and Robert Roe (collectively, the "Parent Plaintiffs") are the parents and legal guardians of Plaintiffs John Doe and Mary Roe (collectively, the "Transgender Plaintiffs"), respectively. They bring this action for themselves and as next friends of the Transgender Plaintiffs.

## II.    *Healthcare Provider Plaintiffs*

11.    Plaintiff Morissa J. Ladinsky, M.D., F.A.A.P., is a pediatrician with over 30 years of experience. Dr. Ladinsky works at the Children's Hospital of Alabama and is an active member of the medical staff at the University of Alabama at Birmingham ("UAB") Hospital, which are both located in Jefferson County, Alabama. She is also an associate professor of pediatrics at UAB School of Medicine in Birmingham, Alabama. Her patients include transgender minors living in Alabama. Dr. Ladinsky resides and works in Jefferson County, Alabama.

12.    Plaintiff Hussein D. Abdul-Latif, M.D. is a pediatric endocrinologist with approximately 25 years of experience. Dr. Abdul-Latif works at the Children's Hospital of Alabama and is an active member of the medical staff at UAB Hospital, which are both located in Jefferson County, Alabama. He is also a professor of pediatrics at the UAB School of Medicine in Birmingham, Alabama. His patients include transgender minors living in Alabama. Dr. Abdul-Latif resides and works in Jefferson County, Alabama.

## III.    *Defendants*

13.    Defendant Kay Ivey is the Governor of the State of Alabama. Governor Ivey is sued in her official capacity as Governor of Alabama.

14.    Defendant Steve Marshall is the Attorney General of the State of Alabama. He is the chief law enforcement officer of the State with the power to

initiate criminal action to enforce the Act. In his capacity as Attorney General, Mr. Marshall has the ability to enforce the Act. Mr. Marshall is sued in his official capacity as Attorney General of Alabama.

15.     Defendant Jill H. Lee is the District Attorney of Shelby County, Alabama. She is the chief law enforcement officer of Shelby County, who prosecutes all felony and some misdemeanor criminal cases which occur within Shelby County. In her capacity as District Attorney, Ms. Lee has the ability to enforce the Act. Ms. Lee is sued in her official capacity as District Attorney of Shelby County, Alabama.

16.     Defendant Danny Carr is the District Attorney of Jefferson County, Alabama. He is the chief law enforcement officer of Jefferson County who prosecutes all felony criminal cases that occur within the Birmingham Division of Jefferson County, including the City of Birmingham. In his capacity as District Attorney, Mr. Carr has the ability to enforce the Act. Mr. Carr is sued in his official capacity as District Attorney of Jefferson County, Alabama.

17.     Defendants each have separate and independent authority to enforce the Act within their respective jurisdictions.

## JURISDICTION AND VENUE

18.     Plaintiffs seek redress for the deprivation of their rights secured by Section 1557 of the Affordable Care Act, the United States Constitution, and the equitable powers of this Court to enjoin unlawful official conduct. This action is

instituted pursuant to 42 U.S.C. § 18116 and 42 U.S.C. § 1983 to enjoin Defendants from enforcing the Act and for a declaration that the Act violates federal law. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

19.     This Court has personal jurisdiction over Defendants because Defendants are domiciled in Alabama and the denial of Plaintiffs' rights guaranteed by federal law occurred within Alabama.

20.     All defendants reside in Alabama, and, upon information and belief, Defendants Lee and Carr reside in this judicial district. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

21.     If enforced, the Act would violate the federal statutory and constitutional rights of Plaintiffs in this judicial district. Therefore, venue is also proper in this district pursuant to 28 U.S.C § 1391(b)(2).

22.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 57 and 65, 28 U.S.C. §§ 2201 and 2202, and this Court's inherent equitable powers.

# FACTUAL ALLEGATIONS

## I.   *Gender Identity and Gender Dysphoria*

23.   Gender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity. Everyone has a gender identity. Most people's gender identity is consistent with their birth sex. Transgender people, however, have a gender identity that differs from their birth sex.

24.   Gender dysphoria is the clinical diagnosis for the distress that arises when a person's gender identity does not match their birth sex. To receive a diagnosis of gender dysphoria, a young person must meet the criteria set forth in the Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[1]   If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

25.   In fact, data indicate that 82% of transgender individuals have considered killing themselves and 40% have attempted suicide. 56% of youth reported a previous suicide attempt and 86% reported suicidality. *See* Austin, Ashley, Shelley L. Craig, Sandra D. Souza, and Lauren B. McInroy (2022),

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder."  The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*. Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."   Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012).

*Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*. J. of Interpersonal Violence. Vol. 37 (5–6) NP2696-NP2718.

26.     Research has shown that an individual's gender identity is biologically based and cannot be changed. In the past, mental health professionals sought to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms. Today, the medical profession recognizes that such efforts are unethical and put minors at risk of serious harm, including dramatically increased rates of suicidality.

27.     Gender dysphoria is highly treatable. Healthcare providers who specialize in the treatment of gender dysphoria follow a well-established standard of care that has been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

28.     The standards of care for treatment of transgender people, including transgender youth, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for

transgender health, including the treatment of gender dysphoria. WPATH published the most recent edition of the Standards of Care for the treatment of gender dysphoria in minors and adults in 2011 and is in the process of finalizing a revised edition of the Standards of Care, which will likely be published later this year.

29.    The Endocrine Society has also promulgated a standard of care for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults. *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinol. Metab. 3869 (2017).

30.    The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations, also follow the WPATH and Endocrine Society standards of care.

31.    The treatment of gender dysphoria is designed to reduce a transgender person's psychological distress by permitting them to live in alignment with their gender identity. Undergoing treatment for gender dysphoria is commonly referred to as transition. There are several components to the transition process: social, legal, medical, and surgical. Each of these components is part of the approved, medically

necessary process for transition, some or all of which may be implemented by a transgender person seeking to transition.

32.     Social transition typically involves adopting a new name, pronouns, hairstyle, and clothing that match that person's gender identity, and treating that person consistent with their gender identity in all aspects of their life, including home, school, and everyday life. Following those steps, transgender people often obtain a court order officially changing their name and, where possible, correcting the sex listed on their birth certificate and other identity documents.

33.     For transgender people who have already begun puberty, it may be appropriate for them to start taking puberty-blocking medication and later hormone-replacement therapy to ensure their body develops in a manner consistent with their gender identity.

34.     Finally, surgical treatment may be part of essential medical care for a transgender individual. The only surgical treatment available to transgender minors is male chest reconstruction surgery, a procedure to remove existing breast tissue and create a male chest contour for transgender males. Like all treatments for gender dysphoria, male chest reconstruction surgery is safe and effective in treating gender dysphoria. The medical necessity of surgical care is determined on a case-by-case basis that considers the age of the patient, medical need, and appropriateness of the procedure relative to the psychological development of the individual.

35.     Longitudinal studies have shown that children with gender dysphoria who receive essential medical care show levels of mental health and stability consistent with those of non-transgender children. Lily Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson, et al., *Mental Health of Transgender Children who are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, children with gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

**II.**   ***The Alabama Vulnerable Child Compassion and Protection Act***

36.     On April 8, 2022, Defendant Kay Ivey signed the Act into law, and the Act will become effective on May 8, 2022.

37.     Despite the essential medical need of many transgender youth in Alabama for puberty blocking medication, hormone replacement therapy, and, in some cases, surgeries, the Act makes it criminal for any person, including healthcare providers, to provide these treatments. The Act likewise makes it criminal for a minor's parents to consent to such treatments.

38.     The Act abandons science and seeks to stop safe, effective, and medically necessary treatments for children with gender dysphoria in Alabama without any rational basis.

39.    The Act ignores established medical science finding that transgender minors who do not receive this essential medical care suffer serious injuries to their physical and mental health.

40.    In short, the Act prevents healthcare professionals from providing, and parents from consenting to, well-established medically necessary care. It also prevents parents from securing and administering such treatments to their transgender children.

41.    Specifically, subsection 4(a) of the Act provides that:

> Except as provided in subsection (b), no person shall engage in or cause any of the following practices to be performed upon a minor if the practice is performed for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex as defined in this act:
>
> (1) Prescribing or administering puberty blocking medication to stop or delay normal puberty.
>
> (2) Prescribing or administering supraphysiologic doses of testosterone or other androgens to females.
>
> (3) Prescribing or administering supraphysiologic doses of estrogen to males.
>
> (4) Performing surgeries that sterilize, including castration, vasectomy, hysterectomy, oophorectomy, orchiectomy, and penectomy.
>
> (5) Performing surgeries that artificially construct tissue with the appearance of genitalia that differs from the individual's sex, including metoidioplasty, phalloplasty, and vaginoplasty.

>       (6) Removing any healthy or non-diseased body part or
>       tissue, except for a male circumcision.

42.     A violation of subsection 4(a) of the Act is a Class C felony, punishable upon conviction by up to 10 years imprisonment or fine of up to $15,000.00.

43.     As a result of subsection 4(a) of the Act, medical professionals, including the Healthcare Provider Plaintiffs, and parents of transgender minors, including the Parent Plaintiffs, are forced to choose between withholding medically necessary treatment from their minor transgender patients or children, on the one hand, or facing criminal prosecution, on the other.

44.     The Act also prohibits the Healthcare Provider Plaintiffs from prescribing or providing medically necessary treatments for gender dysphoria, while at the same time placing no restrictions on the prescription or provision of the same treatments when necessary for other medical conditions. For example, the law permits an endocrinologist to prescribe puberty blocking medication for a child with early puberty while preventing the endocrinologist from prescribing the same medication for a youth with gender dysphoria. Similarly, an endocrinologist may prescribe testosterone for a young person suffering from delayed pubertal development while prohibiting the same endocrinologist from prescribing testosterone for a transgender minor.

45.     By so doing, the Act singles out and prohibits treatment when it is necessary for a transgender person's medical care while allowing the same treatment

when it is necessary for a non-transgender person. Because only transgender individuals experience gender dysphoria, the Act's criminalization of treatments for this medical condition—while permitting the very same treatments for minors to treat other medical conditions—discriminates against individuals based on sex and their transgender status.

46.    The Transgender Plaintiffs are currently receiving medical care, including puberty blockers and hormone therapy, for gender dysphoria. If allowed to take effect, the Act will interrupt these medically necessary treatments, prevent them from obtaining future medically necessary treatments for gender dysphoria, and cause them to experience irreparable physical and psychological harm.

### III.    *Impact of the Act on Plaintiffs*

<u>Robert Roe and Mary Roe</u>

47.    Mary Roe is a 13-year-old transgender girl who resides with her parents in Jefferson County, Alabama.

48.    The Roe family has deep roots in Alabama. Robert Roe is an Alabama native and a state employee. Both Robert and his wife are graduates of public universities in Alabama. The family attends a local Baptist church in Jefferson County.

49.    When Robert and his wife found out their first child was a boy, they were excited to have a son. They named Mary after a revered patriarch in Robert's

family who was also an important figure in the history of the Civil Rights Movement in Alabama.

50.     But, from an early age, Mary started showing behaviors that indicated her female gender identity. Robert and his wife treated Mary as a boy and dressed her in boys' clothing, but Mary would come home from preschool every day and immediately put on dresses.

51.     When she was around six years old, Mary became reclusive and was very often unhappy, including frequent emotional outbursts where Mary would slam her head into the wall. Concerned for her well-being, Mary's parents brought her to a therapist to get insight into her behavior and guidance on how to support her.

52.     Around the same time, Mary began to regularly say that she is a girl. Her statements and actions made clear that this was not simply imaginative play.

53.     Based on the advice of Mary's therapist, Robert and his wife began to permit Mary to wear clothing reflecting her female gender identity outside the home. She wore dresses throughout summer and to church on Sundays. The pastor of the local Baptist church and the entire church community were very supportive of Mary.

54.     Mary's mental health and behavior greatly improved when her parents allowed her to dress as a girl outside the house. She became a happy child who loved playing outside and was able to be just a kid.

55.     By the end of that summer and the beginning of the school year, Robert and his wife advised Mary's school that Mary is transgender and would be returning to school as female. Although the school administration assured them that Mary would be allowed to express her gender identity freely in school and be referred to by her new name, Mary was met with hostility—some accidental, but some intentional. For example, some teachers continued to refer to Mary by her birth name. And her peers—picking up on cues from the teachers—would also use her birth name, and some would refuse to play with her if she tried to correct them.

56.     As a result, Mary's mental health deteriorated again. She skipped classes, hid in the bathroom, went to the nurse's office during class hours to avoid her teachers and other classmates, and hid any documents that bore her birth name. Initial efforts to transfer Mary to another school were unsuccessful. In the summer between first and second grade, Robert and his wife found a new school for Mary.

57.     At the new school, Mary is no longer referred to by her birth name and is accepted as a girl. She dresses as a girl, interacts with others as a girl, and is private about the fact that she is transgender.

58.     Since Mary's transfer to the new school, she has returned to being the happy, active child she was during the summer prior to first grade.

59.    All through these times, Robert and his wife continually checked in with Mary's healthcare providers—including the staff at the transgender health clinic at Children's Hospital of Alabama in Birmingham—for advice and guidance.

60.    When Mary visited her pediatrician in early 2021, the pediatrician confirmed that she had started puberty, and needed to be evaluated to determine whether she is a good candidate for puberty-blocking medication. Mary has been taking puberty blockers since April 2021.

61.    It is essential for Mary's mental health that she continues to receive puberty-blocking medications every three months and is able to obtain any future medical treatments that her healthcare providers determine are medically necessary to treat her gender dysphoria. For Mary to be forced to go through male puberty would be devastating; it would predictably result in her experiencing isolation, depression, anxiety, and distress. Mary's parents are also concerned that without access to the puberty-blocking medication she needs, Mary would resort to self-harm as a means of coping with her psychological distress or even attempt suicide.

62.    Like all parents, Robert and his wife want the best for Mary and have been careful to follow the advice of professionals, making decisions based on the recommendations of healthcare professionals who are following well-established standards of care.

63.    If the Act goes into effect, Mary's medical care will be disrupted. Without access to puberty-blocking medication, Mary's body will produce testosterone, and she will begin to develop secondary sex characteristics associated with males. The changes to Mary's body—some of which would be permanent or would require surgery to reverse—would make visible to others that she is a transgender girl and would cause her to experience again the distress she experiences from having a body seen by others as inconsistent with her female identity.

Jane Doe and John Doe

64.    John Doe is a 17-year-old high school student living in Shelby County, Alabama. He has lived in Alabama all his life. John is a transgender boy.

65.    As a young child, John fashioned his behavior and conduct after other boys. He often asked his parents questions about "boys' activities" and told his father that he thinks he should have been a boy. John also had rules about birthday gifts that were well-known by his friends: no clothes and no pink.

66.    John's parents thought it was a phase, or that perhaps John was a lesbian. It didn't matter either way to his parents; they were very accepting of who he was.

67.    Despite his parents' support, John experienced significant isolation and depression that affected his performance in school and made it difficult for him to sleep. John's parents started taking him to a therapist when he was around eight or

nine years old. Although therapy helped temporarily, John's mental health declined further when he started puberty. He quickly developed large breasts, which was very distressing for John. He would often cry in the shower because of the shape of his chest, wear multiple sports bras at a time, and slouch his shoulders to make the appearance of his chest less prominent. Getting his period was equally distressing for John. John's dysphoria was so severe that he stayed home from school for at least one day each month.

68.    John started trying to counteract the dysphoria he was feeling by changing his appearance to be more masculine. He cut his hair shorter so that it would look like a more typical boys' hairstyle and wore more masculine clothing— anything baggy enough to hide the female-appearing parts of his body. John even grew out his leg hair, which he hid from everyone, including his parents; he loved having hair on his legs. When Jane found out, she made him shave, but John just grew it out again.

69.    It wasn't until John started high school that he developed an understanding of the source of his dysphoria and the vocabulary to explain what he was experiencing. Soon after that, John told his parents that he is transgender. As in the past, his parents were accepting.

70.    Unfortunately, John's peers and school were not as accepting as his parents. In addition to losing several friends, John experienced significant bullying

and harassment. He was also not permitted to use the boys' restroom facilities, which led him to not use the restroom all day until he returned home. Not only did that mistreatment make him feel unwelcome at the school, but not having access to a restroom made it impossible for John to focus while in class. His grades soon began to suffer to the point that he was at risk of failing several classes in both his freshman and sophomore years.

71.     Besides choosing a new name as part of his transition, John began also wearing a binder, which is a compressive garment designed to flatten the appearance of a transgender person's chest so that they have a more male-appearing chest contour. John wore his binder all the time and often for hours longer than he was supposed to. Having the binder became crucial to John's ability to function because it gave him a newfound confidence, which helped buoy him against the mistreatment he experienced in school.

72.     Not long after John came out as transgender, Jane started reaching out to healthcare providers to get John appropriate mental health and medical treatment. She knew of the clinic at UAB due to her work as an interpreter and contacted Dr. Ladinsky. Through the clinic, John was able to connect with both mental health and medical providers who were experienced in working with young people experiencing gender dysphoria.

21

73.    Although John's parents soon thereafter consented to him taking medication to stop his period, it took about a year before he started testosterone. John's healthcare providers conducted a thorough assessment of him, including diagnosing him with gender dysphoria, and both he and his parents researched and talked extensively to John's healthcare providers about the risks, benefits, and alternatives to that treatment. Confident that this course of treatment was in their child's best interests, his parents eventually consented to testosterone treatments for John.

74.    Starting testosterone has been amazing for John. He finally is feeling more like himself, building greater confidence, and is happier overall. Over the past year and a half, John's voice has dropped and he has developed facial hair. Those features have allowed him to feel more comfortable in his body and eased his anxieties about not being treated as a male by others.

75.    The appearance of John's chest, however, continues to be a source of significant distress for him. Due to severe chaffing caused by his binder, John is only able to wear his binder every other day, as recommended by his treating healthcare providers. And, because of the size of his chest, wearing the binder for extended periods of time causes John significant physical discomfort. With the support of his treating mental health and medical providers, John consulted with a surgeon who performs male chest reconstruction surgery on transgender patients. After examining

John, the surgeon indicated that he was a good candidate and was willing to schedule him for surgery later this year.

76.    If the Act is allowed to go into effect, John's medical care will be disrupted because he will not be able to access medications his physicians have prescribed to treat his gender dysphoria. John will also be unable to obtain male chest reconstruction surgery in Alabama until he reaches the age of majority, which in Alabama is age 19. Thus, if the Act is allowed to go into effect, it will lead to devastating physical and psychological consequences for John.

    Dr. Morissa Ladinsky and Dr. Hussein D. Abdul-Latif

77.    Dr. Ladinsky and Dr. Abdul-Latif are physicians at the Children's Hospital of Alabama who provide medical care to transgender young people. Dr. Ladinsky is a pediatrician at the Children's Hospital of Alabama and co-lead of the multi-disciplinary gender clinic at the UAB Hospital. In her practice, Dr. Ladinsky has treated and is currently treating dozens of transgender young people for gender dysphoria, including John Doe and Mary Roe.

78.    Dr. Abdul-Latif is a pediatric endocrinologist at the Children's Hospital of Alabama. He is also a member of the Pediatric Endocrine Society. His medical practice consists of providing medical care to transgender young people, including prescribing puberty blocking medication and hormone therapy to treat their gender dysphoria.

79.     Drs. Ladinsky and Abdul-Latif know, based on data, their observations and years medical practice, as well as their familiarity with medical research on the treatment of gender dysphoria in minors, that transgender young people who receive appropriate medical treatment have improved mental health, better social interactions, and better academic performance, as compared with their peers who do not receive such treatment.

80.     Before Drs. Ladinsky and Abdul-Latif provide medical treatments to their transgender minor patients, one or more mental health providers evaluate the patient, confirm the gender dysphoria diagnosis, and thoroughly assess the patient's mental health, maturity, and readiness to undergo medical treatment for gender dysphoria. Each patient's mental health provider then provides a letter detailing the outcome of their assessment to Drs. Ladinsky and Abdul-Latif.

81.     Both Dr. Ladinsky and Dr. Abdul-Latif then conduct their own assessment of the patient to determine whether they agree with the mental health provider's assessment. Additionally, Drs. Ladinsky and Abdul-Latif meet with the patient and their parents to explain the risks, benefits, alternatives to the treatment and consequences of forgoing it. The patient and their family are also given written materials that review the information covered during the appointment. To ensure that patients and their families take the time to read those materials and discuss them among themselves, the clinic requires the patient to return for an additional

appointment prior to receiving a prescription for either puberty-blocking medication or hormone-replacement therapy.

82.     In the time between appointments, the patient and family are encouraged to discuss their options further with the patient's mental health provider, or to engage with the other services offered by the clinic, such as pastoral care.

83.     At the second appointment, Drs. Ladinsky and Abdul-Latif review the consent forms with the patient and their parents again, giving them another opportunity to ask questions and address any concerns. If, after that discussion, the patient and their parents provide written consent for treatment, and if Drs. Ladinsky and Abdul-Latif believe that such treatment is safe, effective, and medically appropriate for the patient, Drs. Ladinsky and Abdul-Latif will write the necessary prescriptions.

84.     Both Dr. Ladinsky and Dr. Abdul-Latif then see their patients for follow-up care at regular intervals to evaluate the patients' physical and mental health and address any questions the patients or their parents may have.

85.     Drs. Ladinsky and Abdul-Latif's clinical experience treating gender dysphoria is consistent with the medical literature. Puberty-blocking medication and hormone-replacement therapy are safe and effective at treating their patients' gender dysphoria, resulting in significant improvement in their overall health and well-

being and preventing the decompensation seen in transgender minors who are unable to access needed medical treatment.

86.    If the Act goes into effect, thereby denying transgender minors access to this essential treatment, Drs. Ladinsky and Abdul-Latif's patients will experience severe psychological distress and irreversible physical changes to their bodies that will result in long-lasting damage to their health.

87.    Unwilling to violate their professional and ethical duties to their patients, Drs. Ladinsky and Abdul-Latif cannot comply with the Act. As a result of the Act, both Drs. Ladinsky and Abdul-Latif will face the ever-present threat of criminal prosecution and criminal penalties if they continue to provide medically necessary and appropriate treatments for gender dysphoria to their minor transgender patients, consistent with the applicable standard of care.

## CLAIMS FOR RELIEF

### COUNT I
Preemption
Healthcare Provider Plaintiffs and Transgender Plaintiffs Against Defendants in
Their Official Capacities
42 U.S.C. § 18116

88.    Plaintiffs incorporate paragraphs 1 through 87 of the Complaint as if set forth fully herein.

89.    Healthcare Provider Plaintiffs and Transgender Plaintiffs bring this Count against all Defendants.

90.    Under Section 1557 of the Affordable Care Act, "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

91.    The prohibition on sex discrimination in Section 1557 of the Affordable Care Act protects transgender individuals from discrimination by healthcare providers, including physicians and hospitals.

92.    The Transgender Plaintiffs obtain their medical care from providers who are recipients of federal financial assistance and therefore subject to the non-discrimination requirements of Section 1557 of the Affordable Care Act.

93.    The Act subjects the Transgender Plaintiffs to unlawful sex discrimination by preventing them from obtaining medically necessary care related to their transgender status and by requiring their healthcare providers to discriminate against them because they are transgender. As such, the Act conflicts with the non-discrimination requirements of Section 1557. It also conflicts with and undermines the purposes and goals of Section 1557.

94.     In addition, as providers for transgender beneficiaries of Alabama Medicaid, the Healthcare Provider Plaintiffs are recipients of federal financial assistance and therefore subject to the non-discrimination requirements of Section 1557 of the Affordable Care Act.

95.     It is impossible for the Healthcare Plaintiffs to continue to comply with their obligations under Section 1557 and also comply with the restrictions imposed by the Act. On the one hand, refusing to comply with the Act would bring them into compliance with Section 1557, but subject them to criminal penalties under the Act. On the other hand, complying with the Act would subject the Healthcare Plaintiffs to civil liability for discrimination under Section 1557.

96.     The Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, including the objective of preventing discrimination in the provision of healthcare based on sex.

97.     The Healthcare Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause them irreparable harm.

98.     Accordingly, the Healthcare Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT II

Deprivation of Equal Protection
Transgender Plaintiffs Against Defendants in Their Official Capacities
Healthcare Provider Plaintiffs Against Defendants in Their Official Capacities
U.S. Const. Amend. XIV

99.    Plaintiffs incorporate paragraphs 1 through 87 of the Complaint as if set forth fully herein.

100.   Transgender Plaintiffs bring this Count against all Defendants. Healthcare Provider Plaintiffs bring this Count against Defendants Kay Ivey, Steve Marshall, and Danny Carr.

101.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

102.   The Act singles out transgender minors and prohibits them from obtaining medically necessary treatment based on their sex and transgender status.

103.   The Act also treats transgender minors differently and less favorably than non-transgender minors by allowing minors who are not transgender to obtain the same medical treatments that are prohibited when medically necessary for transgender minors.

104.   Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

105.  Transgender-based government classifications are subject, at a minimum, to heightened scrutiny because they are also sex-based classifications.

106.  Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different than their birth sex, they comprise a discrete group. This defining characteristic bears no relation to a transgender person's ability to contribute to society. Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.

107.  As such, transgender classifications are subject to strict scrutiny.

108.  The Act does nothing to protect the health or well-being of minors, or anyone else. To the contrary, the Act undermines the health and well-being of transgender minors by denying them essential medical care.

109.  The Act is not narrowly tailored to further a compelling government interest and is not substantially related to any important governmental interest. Nor is it even rationally related to a governmental interest. Accordingly, the Act violates the Equal Protection Clause of the Fourteenth Amendment.

## COUNT III

Deprivation of Substantive Due Process
Parent Plaintiffs Against Defendants in Their Official Capacities
Violation of Parent Plaintiffs' Right to Direct Their Children's Medically
Necessary Care
U.S. Const. Amend. XIV

110.   Plaintiffs incorporate paragraphs 1 through 87 of the Complaint as if set forth fully herein.

111.   The Parent Plaintiffs bring this Count against all Defendants.

112.   The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000). That fundamental right includes the liberty to make medical decisions for their minor children, including the right to obtain medical treatments that are recognized to be safe, effective, and medically necessary to protect their children's health and well-being.

113.   The Act violates this fundamental right by preventing the Parent Plaintiffs from obtaining medically necessary care for their minor children.

114.   By intruding upon parents' fundamental right to direct the upbringing of their children, the Act is subject to strict scrutiny.

115.   Defendants have no compelling justification for preventing parents from ensuring their children can receive essential medical care. The Act does not advance any legitimate interest, much less a compelling one.

## COUNT IV
Deprivation of Procedural Due Process
All Plaintiffs Against Defendants in Their Official Capacities
Void for Vagueness
U.S. Const. Amend. V and XIV

116.   Plaintiffs incorporate paragraphs 1 through 87 of the Complaint as if set forth fully herein.

117.   All Plaintiffs bring this Count against all Defendants.

118.   Under the Due Process Clause, a criminal statue is void for vagueness if it either (1) fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) authorizes or encourages "arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

119.   Subsection 4(a) of the Act states, in relevant part, that "no person shall … cause any of the following practices to be performed upon a minor …."

120.   As written, the Act does not provide sufficient definiteness to ordinary people, including Plaintiffs, of what actions constitute "caus[ing]" any of the proscribed activities upon a minor.

121.   The lack of definiteness in the Act encourages arbitrary and discriminatory enforcement against anyone who is aware of, refers, discusses, talks about, recommends, or gives an opinion on a transgender person's healthcare.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

(1)  issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that the Act violates federal law for the reasons and on the Counts set forth above;

(2)  permanently enjoin Defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the Act;

(3)  declare that the Act violates the Fifth and Fourteenth Amendments to the United States Constitution;

(4)  award Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(5)  grant such other relief as the Court finds just and proper.

Respectfully submitted this 8th day of April, 2022.

*/s/ Melody H. Eagan*
Melody H. Eagan (ASB-9780-D38M)
Jeffrey P. Doss (ASB-4212-R62D)
Amie A. Vague (ASB-4113-Q46I)
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
205.581.0700
meagan@lightfootlaw.com
jdoss@lightfootlaw.com
avague@lightfootlaw.com

J. Andrew Pratt (*pro hac vice* forthcoming)
Misty L. Peterson (*pro hac vice* forthcoming)
Adam Reinke (*pro hac vice* forthcoming)
Gilbert Oladeinbo (*pro hac vice* forthcoming)
KING & SPALDING LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
404.572.4600
apratt@kslaw.com
mpeterson@kslaw.com
areinke@kslaw.com
goladeinbo@kslaw.com

Brent P. Ray (*pro hac vice* forthcoming)
Abigail J.M. Hoverman (*pro hac vice* forthcoming)
KING & SPALDING LLP
110 North Wacker Drive, Suite 3800
Chicago, IL 60606
312.995.6333
bray@kslaw.com
ahoverman@kslaw.com

Michael B. Shortnacy (*pro hac vice* forthcoming)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
213.443.4355
mshortnacy@kslaw.com

Asaf Orr (*pro hac vice* forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
aorr@nclrights.org

Jennifer L. Levi (*pro hac vice* forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org

Scott D. McCoy (*pro hac vice* forthcoming)
SOUTHERN POVERTY LAW CENTER
P.O. Box 12463
Miami, FL 33101
(334) 224-4309
scott.mccoy@splcenter.org

Diego A. Soto (admission forthcoming)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
334.604.1414
diego.soto@splcenter.org

Jessica Stone (*pro hac vice* forthcoming)
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
404.221.5837
jessica.stone@splcenter.org

Sarah Warbelow (*pro hac vice* forthcoming)
Cynthia Weaver (*pro hac vice* forthcoming)
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Ave., NW
Washington, DC 20036

202.628.4160
sarah.warbelow@hrc.org
cynthia.weaver@hrc.org